## Case No. 7,030.

### The INFANTA.

[Abb. Adm. 263.] [1]

District Court, S. D. New York. April, 1848.

W. Wordsworth, for libellants.
Francis Griffin, for claimant.

BETTS, District Judge. The libels article upon services rendered by the libellants anterior to the shipping agreement, and charge that they form liens upon the vessel to be enforced in this court. The answers deny the indebtedness, and also assert that if it exists, it is in both instances the personal debt of May, the master of the vessel, who, it is alleged, furnished the work of fitting up the vessel under contract with the owner. Each answer, also, excepts to the jurisdiction of the court on the subject-matter. Voluminous proofs have been taken on these issues.

The competency of the evidence offered by the libellants is denied on the part of the claimant, on the ground that no replications were filed to the answers; nor did the libellants give the notice, in writing, allowed by the practice of the court to be given in place of a replication, that they would take testimony in contradiction of the answers. So, also, the admissibility of the testimony of several witnesses taken on a commission to Nova Scotia, is excepted to by the libellants,

[1] [Reported by Abbott Brothers.]

because the names of those witnesses were not furnished them previous to the examination.

Neither objection is maintainable. The libels do not demand the answer of the claimant under oath. Rule 87 of the district court declares, that "an answer need not be put in under oath, unless so required by a sworn libel." Both answers, in these cases, were put in without attestation by oath. Rule 88 dispenses with a replication or written notice in all cases except those in which the libellant intends to offer proof in opposition to the allegations of a sworn answer. Accordingly the libels and answers are before the court merely as pleadings, forming issues between the parties, and open to the same proceedings as if the answers had been sworn to and replications filed.

It is satisfactorily proved, on the part of the claimant, that the names of the witnesses referred to, or the importance of their evidence, were not discovered by the claimant until the commission was put in execution abroad, and in such case the testimony may be taken without previous designation of the witnesses to the opposite party. Rules 42 and 49 of the circuit court supply authority for executing the commission in the manner pursued in this case, and those rules regulate concurrently the practice of this court. Dist. Ct. Rules, 240.

Although these cases must be disposed of on other and general principles, governing actions of this character in the courts of the United States, yet in view of the great labor and expense incurred by the parties in taking these proofs, and with the desire of acquainting myself fully with the merits of the case,—supposing that a suggestion from the court in behalf of the libellants, if they have succeeded in establishing meritorious claims against the vessel, might conduce to an adjustment between the parties, and spare further litigation,—I have taken the pains to go over the evidence in full. A careful examination of the proofs discloses no reason why the court should not apply to these causes the rules which deny jurisdiction to enforce in rem, payment for services rendered to a foreign vessel in her home port, and authorize the court to decline jurisdiction of an ordinary suit for wages, prosecuted between foreigners, for services in a foreign vessel.

First, as to the claim to a lien for the services performed on the vessel while in Nova Scotia. The rendering of these services by each of the libellants was a transaction in a British port and between British subjects. Each contract for those services, whether direct or implied, had its origin within that jurisdiction, and was manifestly intended to be there performed upon both sides. The first element in the claim of a privilege in such debts. attaching them to the body of the vessel, is this: indisputable evidence that the debt had that operation and privilege under the laws of the place where it was contracted. In England, such a debt as is shown in this case would have no privilege, nor could admiralty courts take cognizance of it. Abb. Shipp. 143. The act of 3 & 4 Vict. c. 65, § 6, extending the jurisdiction of the admiralty, applies in respect to necessaries furnished, only to foreign vessels. The law in the provinces stands upon the same footing as in the mother country, in respect to the rights and liabilities of ship-owners. U. S. v. The Recorder [Case No. 16,129]. This court originates no right in respect to debts or contracts which did not accompany their inception. It administers the general maritime law, but will never, in controversies wholly of foreign origin, and between citizens and subjects of the same foreign country, give to either a hypothecation or privilege which he would not have possessed in the home and common jurisdiction. The lien is regarded as being, in effect, an element of the original contract itself and inherent therein. The Nestor [Id. 10,126]; Read v. Hull of a New Brig [Id. 11.609]; The St. Jago de Cuba, 9 Wheat. [22 U. S.] 409.

Courts of general jurisdiction, and proceeding according to the course of the common law, are governed by somewhat different considerations. They give their own remedy in every case suable before them, and it in no way affects their jurisdiction in the matter, that the suitor was not entitled to a like remedy, or indeed to any, in the place of the contract. But the admiralty courts of the United States restrict themselves in this respect. They will not entertain jurisdiction in rem over cases which, in the place of their origin, would not be entitled to that relief. The General Smith, 4 Wheat. [17 U. S.] 438; Peyroux v. Howard, 7 Pet. [32 U. S.] 324; The Marion [Case No. 9,087]; Read v. Hull of a New Brig [supra]; The Nestor [supra]. And as they would not permit the citizens of a state which denies a lien upon its domestic vessels for repairs and supplies. to pursue a vessel into another state allowing such a remedy against its vessels, and to enforce it there, so. for more cogent reasons, in respect to the subjects and ships of a foreign country, a privilege denied them at home would be refused here.

Independent of these legal objections to the actions, the cases could not, I think. be sustained upon the proofs before me, if the claims had originated in this state, or in favor of citizens of a different nation and of different residence from the owners of the vessel.

Second, as to the claim for wages. A suit for wages between parties circumstanced as those now before the court. cannot be sustained. The ship is still on her voyage. and bound from this port to one of the ports of Great Britain. There is no proof that these libellants were forcibly discharged from her. They should, accordingly, have accompanied

her to a home forum, and there pursued their rights. This court has repeatedly discountenanced actions by foreign seamen against foreign vessels not terminating their voyages at this port, as being calculated to embarrass commercial transactions and relations between this country and others in friendly relations with it.[3]

It is expected that a foreign seaman seeking to prosecute an action of this description in the courts of this country, will procure the official sanction of the commercial or political representative of the country to which he belongs, or that good reason will be shown for allowing his suit in the absence of such approval.

Upon the libel of Wood, however, it appears that he gives a credit to the exact amount of his wages, and upon the shipping articles there is endorsed the certificate of the British vice-consul at this port, "that the master has, with his sanction, discharged and paid off Robert Wood, the first mate," dated July 3, 1847. If this evidence does not conclude Wood in any court, it, at all events, affords satisfactory reasons to this court for declining cognizance of the matter, and for remitting him to the tribunals of his own country, where the validity and effect of these official transactions may be properly investigated and determined.

On the same day, the vice-consul certified in the articles, that the master "reports the desertion of George States and other seamen." Any court would receive with great distrust any document or deposition of the master, attempting to set up his free discharge of States from the ship, anterior to such official report that the seaman had deserted. It certainly presents a case more pertinent to the jurisdiction of the British courts, which can more appropriately measure the acts of the official agent of their government, and determine the rights of their own subjects, than can a foreign though friendly tribunal, which might fail of setting a just appreciation upon the polity of her laws of navigation and trade, and might thus unintentionally counteract important public interests in attempting to adjudicate upon the individual demands of her subjects.

Upon these considerations, I shall dismiss both these libels; and to protect the vessel and her master in the ports of the United States against a repetition of these suits, a decree for costs will be ordered against the libellants. Decree accordingly.

[3] See also, Davis v. Leslie [Case No. 3,639], where the grounds upon which the jurisdiction in these cases rests, and the limits within which it will be exercised, are fully stated.